## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

EAST ROCKHILL TOWNSHIP,                  :
                                         :
    Plaintiff/Counterclaim Defendant,    :    Civil Action No.
                                         :    2:18-cv-02382-GAM
    v.                                   :    (Diversity Jurisdiction)
                                         :
RICHARD E. PIERSON MATERIALS             :
CORP. d/b/a R.E. PIERSON MATERIALS,      :    Originally Filed in the Court of
INC. and HANSON AGGREGATES               :    Common Pleas, Bucks County
PENNSYLVANIA, LLC,                       :    Case No. 18-02730
                                         :
    Defendants/Counterclaim              :
Plaintiffs,                              :
                                         :
                                         :
RICHARD E. PIERSON CONSTRUCTION          :
CO., INC.,                               :
    Additional Counterclaim Plaintiff,   :
                                         :
    v.                                   :
                                         :
EAST ROCKHILL TOWNSHIP BOARD OF          :
SUPERVISORS, GARY VOLOVNIK, DAVID        :
NYMAN, JIM NIETUPSKI, and MARIANNE       :
MORANO,                                  :
                                         :
    Additional Counterclaim Defendants.  :

McHugh, J.                                                    March 6, 2019

## MEMORANDUM

This case represents an unusual exercise of federal diversity jurisdiction in that I am

being asked to address what is essentially a local zoning controversy. The municipality involved

is East Rockhill Township in Bucks County, Pennsylvania. The property in question is a quarry

that has been in existence dating back to the 1800s, but one that has not been operational to any

meaningful extent since the 1980s. The owner of the quarry took care to meet the minimal

requirements for keeping the quarry active under Pennsylvania law and regularly applied for the zoning permit required under the Township ordinance, albeit without engaging in the extraction of stone. A large Pennsylvania Turnpike project made reactivation of the quarry economically attractive, and the quarry's owner entered into a lease with a large road construction company and its affiliated material supplier to supply stone for that project. Once Township officials and local residents recognized the implications of reactivation of the quarry, a dispute ensued, leading to a series of zoning hearings over the span of a year.

In addition to extracting stone, the lessees of the property proposed to install and operate an asphalt plant, contending that such activity is a permissible "accessory" use under Pennsylvania zoning law. When Township officials became concerned that the contractors were moving forward with installation of the asphalt plant, they brought suit to enjoin the installation in state court. The quarry owner and contractors removed the action to this Court and brought a counterclaim under 28 U.S.C. § 2201, seeking injunctive relief in the form of a declaration that the Township's attempts to regulate operation of the quarry are preempted by the Pennsylvania Mining Act and further seeking a declaration that an asphalt plant is a permitted accessory use.

After two days of testimony followed by oral argument, the record supports the following findings of fact and conclusions of law.

**FINDINGS OF FACT**

East Rockhill Township ("the Township") is a township of the second class located in Bucks County, Pennsylvania. Richard E. Pierson Materials Corp. and Richard E. Pierson Construction Co., Inc. (collectively "Pierson") are Delaware corporations in the business of producing construction materials and performing public and private construction work,

respectively.  Hanson Aggregates Pennsylvania, LLC ("Hanson") is a Delaware limited liability company which owns and operates quarries throughout Pennsylvania.

Hanson is the owner of eleven contiguous parcels in the Township, totaling approximately 267.32 acres with frontage on North Rockhill and Quarry Roads.  The portion of the total Hanson property that comprises the Rockhill Quarry consists of approximately 109.8 acres.  In late November 2017, the Pennsylvania Turnpike Commission awarded Pierson Construction a contract for work on the northeast extension of the Turnpike with a value in excess of $224 million.  In connection with that project, in early December 2017, Pierson Materials entered into a lease agreement with Hanson to lease the quarry property.  Although the Turnpike project represented Pierson's first priority in leasing the quarry, it intended to use stone mined there and asphalt produced there in connection with other projects as well.

The property was developed for use as a quarry in the late 1800s, and the land has had no different use since.  Various improvements over time have included the quarry pit itself, internal roads, some paved areas, certain settling ponds, storm water basins, and small buildings related to the quarry.  During periods when the quarry was functioning, portable crushing equipment, permanent crushing equipment, scales, and storage bins were on-site, and some were on concrete foundations.  For much of its life as a quarry, the property also contained an asphalt plant with related storage.  Around 1984, because of changing economic conditions, the quarry ceased operating, and virtually all equipment was removed, although some concrete foundations remained.  There does not seem to be any dispute that, despite periodically scaling back quarrying operations, the owner of the quarry property has always:  (a) maintained an active

mining permit with the Pennsylvania Department of Environmental Protection ("DEP")[1] and (b) obtained annual zoning permits for quarry use from the Township.

When the quarry was first established, the Township had no zoning ordinance. The first such ordinance was enacted in 1970. That ordinance established a mining district where the quarry was located, and in the mining district, surface mining, like the stone extraction involved in quarry operations, was permitted by right. The 1970 ordinance included a chart of permitted activities, extending to "normal operational needs of the industry." It should be noted that the Pennsylvania Municipalities Planning Code, adopted in 1968, requires that "[z]oning ordinances shall provide for the reasonable development of minerals in each municipality." 53 Pa. Stat. Ann. § 10603(i) (West).

In 1987, the Township amended its zoning ordinance. A technical change renamed the zone where the quarry was located the "Extraction Zone District." Substantively, the ordinance stated that operation was permitted by special exception, and certain other requirements were imposed, including the requirement to obtain an annual permit. Geographically, the 1987 ordinance rezoned a portion of the quarry from mining use to "Resource Protection" and reduced the area falling within the new Extraction Zone District down to approximately 136 acres. In practical terms, however, only a very small portion of the property actually used for any mining-related purpose falls outside the Extraction Zone District. Furthermore, the area that East Rockhill has designated for Resource Protection coincidentally falls outside the area where the DEP permits the quarry operator to extract stone. Nonetheless, the 1987 Ordinance also imposed

---

[1] To maintain a quarry in active status under the controlling DEP regulations, the quarry owner must extract at least 500 tons of stone a year. A controversy has arisen as to whether Hanson actually removed 500 tons per year or made a pretense of doing so. That question is not before me and will be resolved through the appropriate inquiries to state officials. For purposes of my analysis, I am proceeding on the basis that DEP currently considers the quarry to have been continuously active since the annual extraction requirement was instituted.

new dimensional requirements, such as setbacks, buffer zones, fencing, and signage that could result in various areas of the quarry property being deemed non-conforming.

Local regulation of quarries was significantly affected by the Noncoal Surface Mining Conservation and Reclamation Act ("the Mining Act"). 52 Pa. Stat. Ann. §§ 3301-3326 (West). Section 3303 of the Mining Act defines "surface mining" broadly and specifically includes quarrying activity. 52 Pa. Stat. Ann. § 3303 (West). The Township does not dispute that, under the Mining Act, the Pennsylvania General Assembly placed regulation of surface mining under the exclusive jurisdiction of DEP. More importantly, Section 16 of the Mining Act expressly supersedes and preempts all local ordinances purporting to regulate surface mining within the Commonwealth and provides as follows:

> Except with respect to ordinances adopted pursuant to the act of July 31, 1968 (P.L. 805, No. 247), known as the Pennsylvania Municipalities Planning Code, all local ordinances and enactments purporting to regulate surface mining are hereby superseded. The Commonwealth, by this enactment, hereby preempts the regulation of surface mining as herein defined.

52 Pa. Stat. Ann. § 3316 (West).

Since the Mining Act took effect, the owners of the quarry have applied for and obtained a mining permit from the DEP. In connection with this project, either Hanson or Pierson have obtained the following permits from DEP:

(i)     A National Pollutant Discharge Elimination System (NPDES) permit, with the most recent being Permit No. PA0594121 (renewal approved through July 19, 2023).

(ii)    An Erosion and Sedimentation Plan approval (with the most recent being dated June 28, 2018).

(iii)   An Air Quality Permit to operate temporary crushing equipment, dated March 14, 2018.

(iv)     An Air Quality Permit to operate permanent crushing equipment, dated December 27, 2018.

(v)      A General Permit to operate an asphalt plant and diesel generators, dated September 7, 2018.

(vi)     A Mining License in favor of Pierson Materials, dated October 26, 2018.

(vii)    A Mining License in favor of Hanson, dated January 4, 2018.

In connection with the exercise of its regulatory authority, the DEP requires quarry owners or operators to submit detailed "Modules."  For practical purposes, the Modules cover all of the issues typically associated with local land use regulation, including geology, hydrology, water pollution, erosion, sedimentation, and the protection of wetlands and streams. Operationally, the DEP specifies a "Mining Area" within which stone can be extracted and a broader surface area for related activities.  The DEP regulates blasting, air pollution, and noise, and it requires quarry owners to prepare land use and reclamation maps, to consider issues of land use and vegetation, and to address post-mining land use and reclamation, including revegetation.  During the hearing, Pierson provided copies of all current Modules that have been submitted to DEP, and the record is clear that they are being updated on a regular basis. Pursuant to the licenses and permits issued by the DEP, Pierson has proceeded with improvements to the quarry site to render it fully operational, including restoration of roads and buildings and installation of some crushing equipment.  As discussed more fully below, other equipment, including the equipment necessary to produce asphalt, has been purchased but remains stored off-site.

In response to concerns expressed by nearby property owners, DEP conducted seismic tests of blasts at the quarry, and upon discovery that certain veins of stone contained asbestos,

6

did more testing and imposed requirements for ongoing testing as various deposits of stone are extracted. At the time of the hearing in this case, DEP had stopped all activities at the quarry because of the discovery of more asbestos-containing stone. At oral argument, counsel for the Township conceded that DEP is aware that the Township seeks to limit or halt activities at the quarry, but DEP has lent no support to the Township's efforts, has not ceased issuing permits, and continues to exercise state regulatory authority over the site.

Despite the Pennsylvania statutory scheme and DEP's assertion of its jurisdiction and authority, the Township has refused to issue a zoning permit for quarry operations. After a series of communications and an initial denial, Township zoning officer Marianne Morano issued a letter on January 12, 2018: (i) stating in part that a special exception is required to conduct quarry operations at the site, (ii) listing various requirements of the current Zoning Ordinance with which she feels Pierson has not complied, (iii) advising that relief must be obtained from the Zoning Hearing Board for the asphalt plant component of the quarry, (iv) officially denying the 2018 Application Materials, (v) further advising that land development approval would be required in order to bring the portable quarrying equipment to the property or to reconstruct or place trailers on the existing building foundations on-site, and (vi) ordering that the H12 use and related improvements must cease and desist until all of the approvals are obtained. A denial as to operation of the proposed asphalt plant followed in late March 2018 in the form of a Notice of Violation from the Township's counsel.

An appeal to the Zoning Hearing Board followed. A total of eight hearings, lasting from three to four hours each, have taken place between April 2018 and January 2019. Approximately 43 individuals and two organizations have requested and been granted party status in the Appeals, and only two witnesses have testified to date.

With respect to the separate issue of the asphalt plant, the record is clear that production of asphalt was carried on at the quarry for a substantial portion of its operational life. It is also clear that by 1984, if not sooner, there was no asphalt production at the site, and asphalt-producing equipment has been removed, leaving behind only remnants of the foundations of structures used in its production. The significance of that fact relates to the Township's amendment of its zoning ordinance in 1987, which, as interpreted by the Township, considers asphalt a "Manufacturing" use that would not be permitted within the Extraction District, but only within the Township's Industrial District. The evidence has also shown that, although asphalt plants function as stand-alone operations, with Pierson itself operating three, such plants are frequently located at quarries because of efficiency. In pure form[2], asphalt is a mixture of crushed stone and specialized oil, and producing the asphalt where the stone is mined eliminates the need to transport the stone off-site. The evidence has shown that within geographic regions similar to East Rockhill Township, a wide majority of quarries have asphalt plants on-site. But having made this finding, as discussed below, I am not persuaded that it carries the significance that Pierson suggests.

As to the proposed asphalt plant at this quarry, the equipment cost for the asphalt plant, including conveying and processing equipment, controls, and postproduction silos, totals approximately $5.5 million, as compared to approximately $8 million for stone crushing equipment. To run the asphalt plant would require the hiring of four to five additional employees. These facts have legal significance under the Pennsylvania case law discussed below. In operational terms, the asphalt plant would require storage of approximately 20,000

---

[2] Asphalt can also be produced by taking the remnants of milled roadway from highways undergoing reconstruction and mixing it with oil and a smaller quantity of "fresh" stone, in a form of industrial recycling. Pierson contemplated some degree of asphalt production using this technique at the Hanson quarry site.

gallons of oil on-site and three silos with the total capacity of 600 tons to handle the final product. Richard Pierson, the founder and majority owner of both Pierson Construction and Pierson Materials, estimated that the asphalt plant would be in operation between 150 and 200 days per year, including nighttime operation when required for highway projects being conducted after-hours.

I note that the evidence submitted during the hearing addressed many additional issues, including the fine points of Pennsylvania zoning law, but the facts found above provide a sufficient basis for decision.

## CONCLUSIONS OF LAW

### Abstention

A threshold question is whether I should abstain from ruling, notwithstanding the existence of diversity jurisdiction. As to some of Pierson's counterclaims, abstention would be improper. Its claims under Section 1983 are subject to federal question jurisdiction, and its claim for tortious interference is subject to federal diversity jurisdiction. But the same is not true of its claims under the Declaratory Judgment Act. Although diversity exists, I am not bound to rule. Any confusion in that regard was resolved by the Supreme Court in *Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995). There, it held that "[i]n the declaratory judgment context, the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration." *Id.* at 288. The statute "confers a discretion on the courts rather than an absolute right upon the litigant." *Id.* at 287.

The Township raised the issue of abstention for the first time in its trial brief, after eight months of litigation. Pierson is correct that this operates as a strong argument in favor of waiver. Further undercutting its argument that federal jurisdiction is inappropriate, the Township availed

9

itself of the services of Magistrate Judge Richard Lloret of this Court for extensive discussions

attempting to negotiate a resolution of this matter.

As to the merits of abstention, the Township is correct that there is a parallel state

proceeding, which carries significant weight in deciding whether a federal court should abstain.

*Reifer v. Westport Ins. Corp.*, 751 F.3d 129, 144-45 (3d Cir. 2014). Both the Defendants' right

to operate a quarry and their request to operate an asphalt plant are before the Bucks County

Court of Common Pleas.[3] But it is important to recognize the difference in the issues presented.

Hanson/Pierson has been denied a zoning permit notwithstanding a state statute that broadly,

albeit not absolutely, preempts local regulation of the operation of quarries. The record is clear

that the Township consistently issued a zoning permit for the quarry as far back as 1991, until

such time as its owner actually attempted to engage in quarrying activities, and more than a year

has elapsed in proceedings before the Zoning Hearing Board with no resolution imminent. The

quandary in which Pierson finds itself weighs in favor of federal jurisdiction because, as the

Court of Appeals has recognized, "diversity jurisdiction has roots in apprehensions of local

prejudice toward foreign suitors in the state courts." *DiRuggiero v. Rodgers*, 743 F.2d 1009,

1018 (3d Cir. 1984) (citing *Bank of the United States v. Deveaux,* 9 U.S. (5 Cranch) 61, 87

(1809)).

In contrast, as to the asphalt plant, as discussed more fully below, Pennsylvania law is far

from clear, and if anything, the weight of authority cuts against Hanson/Pierson. Federal courts

may properly abstain despite the existence of diversity jurisdiction "where a difficult question of

state law is presented which involves important state policies or administrative concerns."

*Heritage Farms, Inc. v. Solebury Twp.*, 671 F.2d 743, 746 (3d Cir. 1982). "Where state law is

---

[3] The Township moved to enjoin operation of the asphalt plant, and Hanson/Pierson asserted a counterclaim seeking permission to operate the quarry.

uncertain or undetermined, the proper relationship between federal and state courts requires district courts to 'step back' and be 'particularly reluctant' to exercise DJA jurisdiction." *Reifer*, 751 F.3d at 148 (citation omitted). In that regard, it bears emphasis that Hanson/Pierson's arguments with respect to the asphalt plant are rooted in the fine points of Pennsylvania zoning law, and "[f]ederal courts have expressly disavowed any desire to sit as a statewide board of zoning appeals hearing challenges to actions of municipalities." *Izzo v. Borough of River Edge*, 843 F.2d 765, 769 (3d Cir. 1988) (citing *Heritage Farms*, 671 F.2d at 748). And such principles do not lose force "simply because one party or, indeed, both parties, perceive some advantage in the federal forum." *State Auto Ins. Companies v. Summy*, 234 F.3d 131, 136 (3d Cir. 2000).

Taking these principles into account, I will accept jurisdiction under the Declaratory Judgement Act as to the issuance of a permit for the quarry. I will, however, decline jurisdiction, sever, and remand with respect to the asphalt plant, for reasons related to the uncertain merits of that claim, which are discussed more fully below.

**The Zoning Permit for the Quarry**

As noted above, the Mining Act expressly supersedes and preempts all local ordinances purporting to regulate surface mining within the Commonwealth, except for land use regulations adopted pursuant to the Pennsylvania Municipalities Planning Code ("MPC"). 52 Pa. Stat. Ann. § 3316 (West). Not all local regulation is prohibited, but Pennsylvania appellate cases have drawn a clear distinction between limitations on *where* mining may take place, over which municipalities retain some degree of control, and limitations on the *operation* of a mine such as a quarry, which falls under the exclusive jurisdiction of the DEP. For example, in *Warner Co. v. Zoning Hearing Bd. of Tredyffrin Twp.*, the Court held that that setback requirements and the designation of uses permitted by special exception are traditional land use regulations, with the

11

result that such requirements are not preempted by the Mining Act.  612 A.2d 578, 582 (Pa.

Commw. Ct. 1992).  In contrast, attempts to regulate surface activities, such as buffers and

berms, overburden storage, reclamation and drainage structures—issues already addressed by the

Mining Act and the operator's DEP mining permit—are not subject to local control.  *Id.*  In

similar fashion, where a local zoning ordinance included regulation of coal extraction, blasting,

and stormwater runoff, the Commonwealth Court held that such interference in the operation of a

quarry was impermissible under the Mining Act.  *Pa. Coal Co., Inc. v. Twp. of Conemaugh*, 612

A.2d 1090, 1092-93 (Pa. Commw. Ct. 1992*)*; *see also Tinicum Twp. v. Del. Valley Concrete*, 812

A.2d 758, 764 (Pa. Commw. Ct. 2002) (township's attempt to regulate blasting preempted);

*Geryville Materials, Inc. v. Planning Comm'n of Lower Milford Twp.*, 74 A.3d 322, 329-30 (Pa.

Commw. Ct. 2013) (DEP, rather than municipality, responsible for regulation of wetlands,

groundwater, surface water, and streams at quarry).

Of particular note is the Commonwealth Court's decision in *Gibraltar Rock, Inc. v. New

Hanover Twp.*, 118 A.3d 461 (Pa. Commw. Ct. 2015).  There, a quarry operator sought a

declaratory judgment that a township's Storm Water Management Ordinance was preempted by

the Mining Act.  After review of the record, the Court summarized the law as follows:

> In defining the relationship between the Noncoal Act's preemption provision and
> land use regulation, this Court has recognized a distinction between an ordinance
> or zoning provision governing *where* a facility may be located (which is not
> preempted) and, on the other hand, an ordinance or operational regulation
> dictating *how* the facility will be technically designed and operated (which is
> preempted).

*Id.* at 466 (citing *Geryville*, 74 A.3d at 327, 329-30).  Because the ordinance focused upon how

to manage stormwater that was generated from the quarry, the ourt concluded that it sought to

regulate "construction" and "surface activities" that are "connected with surface . . . mining," and

was therefore preempted.  *Id.* at 467 (citation omitted).  It did not matter to the Court that the

12

quarry operator could in theory have complied with both the local ordinance and the state statute

because regulatory authority rested exclusively with the Commonwealth. Nor did it matter

whether the ordinance was specifically directed at mining activities: "[r]egardless of whether an

ordinance applies specifically to a quarry or is neutral on its face, the ordinance will be

preempted as an operational regulation if it regulates 'surface mining' as that term is statutorily

defined." *Id.* at 466.

The examples brought forth by the Township at the evidentiary hearing as to the types of

regulation it seeks to enforce actually cut against its position. For example, the zoning ordinance

has a provision governing the degree of slope that may exist at a property. Not surprisingly,

given that the quarry that has existed for more than 100 years, the wall of rock at the edge of the

mining pit is more aptly described as a cliff. Applying the Township's slope requirement would

render quarrying operations impractical if not impossible. Similarly, the Township cited the

woodlands preservation provision of its ordinance, pointing to an area within the mining zone

where trees will likely be removed. But it ignores the fact that DEP necessarily knew of that

impact when it authorized mining activity in that specific area and further ignores the fact that

DEP has requirements for replacement of vegetation and reclamation of the land when the quarry

ceases operation.

The Township also raises the inventive argument that restoration of buildings and

installation of equipment at the quarry requires "Land Development" approval, which it has the

right to regulate under the Municipalities Planning Code. *See* 53 Pa. Stat. Ann. § 10107 (West).

In *Upper Southampton Twp. v. Upper Southampton Twp. Zoning Hearing Bd.*, the Supreme

Court made clear that "[t]he MPC, when viewed as a whole, clearly is intended to apply to the

allocation of land in such a way that issues related to public use, water management, sewers,

streets and the like must be addressed," and that "it is precisely this kind of large-scale development of land, with an inevitable and concomitant effect on the public generally, that is contemplated . . . ." 934 A.2d 1162, 1168 (Pa. 2007). If Hanson proposed to *expand* its footprint in the Township and convert land zoned for residential use as part of its reactivation of the quarry, the Township could assert land development authority. *See Lehigh Asphalt Paving & Construction Co.*, 830 A.2d 1063, 1071 (Pa. Commw. Ct. 2003). But reconstruction, within the state-authorized zone, of buildings necessary to operating the quarry falls beyond the Township's reach under the Mining Act.[4]

Based on the clear language of the statute and substantial Pennsylvania case law, I am confident in assuming jurisdiction as to this issue and ruling that the Township may not regulate the operation of the quarry or seek to limit the amounts of stone it extracts or processes from within the area specifically authorized by DEP. Hanson/Pierson are entitled to a declaration that: 1) the Township may not require Hanson or Pierson to comply with its H-12 Extractive Operation Use Provisions; 2) the Township may not require Hanson or Pierson to obtain a special exception in order to increase extraction activities; and 3) the Township may not require Hanson or Pierson to obtain land development approval before installing new equipment or buildings specifically related to its mining operation. I also conclude that Hanson/Pierson are entitled to injunctive relief because they have established a substantial likelihood of success on the merits and because their inability to engage in quarrying activities on the property represents immediate, substantial, and irreparable harm to them, given the requirements of the contract with the Turnpike Commission and the prolonged delay that has resulted from the Township's

---

[4] It is unlikely that Section 107 of the MPC would apply even in the absence of the Mining Act. *See Tu-Way Tower Co. v. Zoning Hearing Bd. of Twp. of Salisbury*, 688 A.2d 744, 747-48 (Pa. Commw. Ct. 1997) (on-site improvements to existing communications facility, including the erection of buildings, did not constitute land development).

attempts to regulate their activities on-site.  I am further persuaded that, given the Pennsylvania

statutory scheme and DEP's endorsement of Hanson/Pierson's activities at the site, the public

interest is served by the issuance of such an injunction.

It should also be noted, however, that the restriction upon the Township's authority to

interfere with the operation of the quarry does not preempt the application of all zoning

ordinances.  As the Supreme Court recognized in *Hoffman Mining Co. v. Zoning Hearing Bd. of

Adams Twp.*, certain limitations remain applicable.  32 A.3d 587, 600 (Pa. 2011); *see also

Warner*, 612 A. 2d at 582.  Similarly, the Township retains the right to bring an action for public

nuisance if the activities of the quarry rise to that level by creating a danger to the public.

*Tinicum Twp.*, 812 A.2d at 765.  But the Township is cautioned to recognize the unambiguous

limitations on its authority under Pennsylvania law.

**The Asphalt Plant**

The tenuous arguments advanced by Hanson/Pierson in claiming a right to operate an

asphalt plant stand in stark contrast to the strength of their position as to the quarry.  Defendants'

principal argument is that the asphalt plant is a permitted accessory use under Pennsylvania

zoning law.  This may be a colorable argument, but Pennsylvania law is far from clear, and if

anything, the weight of authority is strongly to the contrary.

The Pennsylvania Supreme Court addressed this issue in *In Re Mignatti Appeal*, 168

A.2d 567 (Pa. 1961).  There, a quarry operator sought to install a bituminous concrete mixing

plant to mix the stone removed from the quarry with asphalt being brought on to the premises.

The Supreme Court held that such activity "encompasses phases and operations actually

severable from the industry of quarrying and stone crushing."  *Id.* at 568.  It noted that the

bituminous plant would require installation of additional equipment requiring a significant

capital investment and occupying an area on the site measuring 90 by 90 feet. It further observed that truck traffic would be required, asphalt storage tanks would be erected on the premises, and a significant quantity of oil would be transported to and stored on the premises for the mixing operation. *Id.* at 568-69. As in this case, an increase in the workforce was required to operate the mixing plant. The Court concluded that this would "also create problems of space, storage and traffic hereto foreign to the existing use. As such, it is severable from the whole as an independent process . . . ." *Id.* at 569. The Commonwealth Court subsequently relied upon this reasoning in concluding that the operation of an asphalt plant at the site of a quarry was a "severable" and "independent" process from the operation of quarrying and stone crushing, and therefore "not an integral part thereof." *Hilltown Twp. v. Horn*, 320 A.2d 153, 156-57 (Pa. Commw. Ct. 1974), *rev'd on other grounds sub nom. Horn v. Twp. of Hilltown*, 337 A.2d 858 (Pa. 1975).

As set forth in the Findings of Fact, the proposed asphalt plant in this case presents similar circumstances. The capital investment necessary for the asphalt plant is nearly as great as the cost of equipment required for quarrying, and the workforce would increase by four to five employees. In short, the same concerns addressed by the Pennsylvania Supreme Court in *Mignatti* would be present here. Pennsylvania law, as described in *Mignatti* and *Hilltown* could naturally lead one to conclude that the proposed asphalt plant constitutes a severable, independent operation from quarrying.

Hanson/Pierson seek to avoid the rule in *Mignatti* through a series of arguments as follows: "(1) the zoning ordinance in *Mignatti* excluded 'asphalt manufacture or refining' from the relevant zoning district; (2) the *Mignatti* quarry was located on a property zoned residential and the quarry was a non-conforming use; (3) the owners of the quarry property were applying

for a special exception and had never previously installed or operated an asphalt plant as part of

the prior nonconforming use of the property as a stone quarry and the introduction of the plant

was a wholly new operation that was being carried on for the first time after the passage of the

prohibitive zoning ordinance; (4) *Mignatti* predates the Mining Act, so there is no discussion of

whether the municipality's regulation of Mignatti's asphalt plant was preempted by the Mining

Act; and (5) in 1961, when *Mignatti* was decided, the DEP General Permit, which allows

accessory asphalt plants in conjunction with facilities with valid mining permits, did not exist."

Defs.' Pretrial Mem. at 35-36, ECF No. 60.

These arguments miss the mark for a variety of reasons. In *Mignatti*, the Supreme Court

effectively adopted a model for determining whether an asphalt plant is a "severable" and

"independent" process from quarrying. The same considerations forming the basis for the

Court's decision there are present in this case. *Mignatti* has not been criticized, let alone

overruled, and the rule in Pennsylvania is that, "for the sake of certainty, a conclusion reached in

one case should be applied to those [that] follow, if the facts are substantially the same, even

though the parties may be different." *Commonwealth v. Tilghman*, 673 A.2d 898, 903 n.9 (Pa.

1996) (citation omitted). This is not to say that old precedent can never be reconsidered if an

industry evolves, *see T.W. Phillips Gas & Oil Co. v. Jedlicka,* 42 A.3d 261, 271-72 (Pa. 2012),

but such reconsideration is not the role of this Court.

As to the fine points of Pennsylvania zoning law, Hanson/Pierson concede that the

asphalt equipment was removed by 1983, and the controlling ordinance in this case was adopted

by the Township in 1987, leaving me puzzled by their argument that there was a previously

existing non-conforming use. But I make that observation only in passing, because for the

17

reasons set forth above, particularly in light of *Mignatti*, it is not my place as a federal judge

sitting in diversity to address the fine points of Pennsylvania zoning law.

As to the argument that *Mignatti* was decided before passage of the Mining Act, if

anything, this refutes Hanson/Pierson's position because the Mining Act makes no mention

whatsoever of asphalt processing. To the extent that the argument is that asphalt plants have

historically been operated on the sites of quarries, the legislature had the opportunity to

recognize and endorse such operations, and to preempt their regulation by local authorities. The

fact that DEP has a streamlined process for issuing permits to holders of mining licenses simply

has no bearing on the applicability of local zoning ordinances. Similarly, the fact that DEP

regulates the operation of asphalt plants carries little weight, because it does so regardless of

whether the plant is located at the site of a quarry or elsewhere. But in any event, such

arguments are more properly made to Pennsylvania courts.

In short, Hanson/Pierson would have me ignore what appears to be controlling precedent

from the Pennsylvania Supreme Court, assume that Pennsylvania law has evolved despite the

absence of any new decision from that Court, and then rule in its favor based upon a highly

nuanced and fact-specific analysis of Pennsylvania zoning law. To employ the Declaratory

Judgment Act to decide such issues would be an abuse of my discretion, as such matters are

properly within the province of the state courts.


        <u>/s/ Gerald Austin McHugh</u>
        United States District Judge