# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **EAST ROCKHILL TOWNSHIP,** | : |
| Plaintiff/Counterclaim Defendant, | : Civil Action No.<br>: 2:18-cv-02382-GAM<br>: (Diversity Jurisdiction) |
| v. | : |
| **RICHARD E. PIERSON MATERIALS CORP. d/b/a R.E. PIERSON MATERIALS, INC.** and **HANSON AGGREGATES PENNSYLVANIA, LLC,** | : Originally Filed in the Court of<br>: Common Pleas, Bucks County<br>: Case No. 18-02730 |
| Defendants/Counterclaim Plaintiffs, | : |
| **RICHARD E. PIERSON CONSTRUCTION CO., INC.,** | : |
| Additional Counterclaim Plaintiff, | : |
| v. | : |
| **EAST ROCKHILL TOWNSHIP BOARD OF SUPERVISORS, GARY VOLOVNIK, DAVID NYMAN, JIM NIETUPSKI,** and **MARIANNE MORANO,** | : |
| Additional Counterclaim Defendants. | : |

**McHugh, J.**                                                                                                                                                         **June 4, 2019**

## MEMORANDUM

This case arises out of a zoning dispute involving a long dormant quarry that sprung back to life in a residential area, sparking protests from neighbors affected by its operation. Although the quarry is located in an area zoned for mineral extraction and primarily regulated by the Pennsylvania Department of Environmental Protection, local officials sought to impose additional conditions on its operations in response to residents' concerns and hesitated to issue an operating permit. Then, fearing that the quarry owner and operator were about to install an

1

asphalt plant on site, the Township sought to enjoin them from doing so in state court. The owner of the quarry along with the operator of the site removed the enforcement action to this court, seeking injunctive relief to permit their operations, which I granted in part. *East Rockhill Twp. v. Richard E. Pierson Materials Corp., et al.*, 364 F. Supp. 3d 436 (E.D. Pa. 2019).

They have also asserted counterclaims for damages against the Township and local officials. One is a civil rights claim asserting a denial of substantive due process. The second is a state law claim alleging tortious interference with the quarry operator's contract to supply stone for a state highway project. The Township and its officials moved to dismiss these counterclaims. Because I am persuaded that no reasonable jury could find Defendants' actions shocking to the conscience, and because the actions Defendants took affecting the contract were privileged, I will grant the motions to dismiss.

## I. Factual Background[1]

In November 2017, Pierson Construction was awarded a contract by the Pennsylvania Turnpike Commission to widen and improve part of the Pennsylvania Turnpike ("the Turnpike Project"). To complete the Turnpike Project, an affiliated entity of Pierson Construction, Pierson Materials, leased the Rockhill Quarry in East Rockhill Township. When Pierson Materials notified the Township of its plans to use the quarry to obtain material and produce asphalt, the underlying dispute ensued. Counterclaim Plaintiffs here include Richard E. Pierson Materials Corp. and Richard E. Pierson Construction Co., Inc. (collectively "Pierson") as well as Hanson Aggregates Pennsylvania, LLC ("Hanson"), which owns the property that contains the Rockhill Quarry. Counterclaim Defendants include the Township, East Rockhill Township Board of

---

[1] A more detailed recitation of the facts is set forth in my opinion addressing equitable relief. *See id.*

Supervisors ("the Board"), Township Manager and Zoning Officer Marianne Morano, and Board members Gary Volovnik, David Nyman, and Jim Nietupski.

The quarry in question has been in existence and operated at some level since 1890. Asphalt production has periodically occurred at the site, but the equipment for such production was removed in the early 1980s when quarrying operations were reduced substantially. In the eyes of its neighbors, the quarry had long been inactive, *see* Defs.' Counterclaim Ex. G; Defs.' Counterclaim Ex. K, and the demographics of the area around the quarry had changed in that time. *See* Defs.' Counterclaim Ex. G. But Hanson continuously maintained Department of Environmental Protection (DEP) permits for the quarry, so as to remain in "active operation" for purposes of the controlling state statute, 52 P.S. § 3303.[2] It also obtained annual zoning permits from the Township.

In November 2017, Pierson informed the Township of its plans to lease the quarry for the Turnpike Project and its specific plans to produce asphalt. According to the Counterclaim, Pierson sought to "bring in portable quarrying equipment to be located on existing impervious areas of the site," "bring in portable asphalt making equipment to be located on existing impervious areas of the site and placed in the same areas (using existing foundations and footings) as prior asphalt making equipment," and "place temporary trailers on the existing foundations of prior buildings." Defs.' Counterclaim ¶ 55. Pierson provided a tour of the quarry to Zoning Officer Morano in December 2017, and on December 11 and December 21, 2017, Pierson submitted two letters to the Township regarding the proposed operations. *See* Defs.' Counterclaim Ex. E; Defs.' Counterclaim Ex. F. Pierson then began preparations for asphalt production, ordering equipment and materials, preparing the site, and hiring personnel.

---

[2] Under Pennsylvania law, a permit may be maintained as "active" so long as a certain minimal cottage is extracted each year, even if the quarry is not marketing its product to the public.

On December 26, 2017, numerous local residents attended a meeting of the Township Board of Supervisors and expressed opposition to the proposed increase in quarrying operations. On December 28, 2017, Morano emailed DEP, copying various other officials. She described the concerns of local residents and asked DEP to delay issuing approvals until after the Township could meet with DEP about the changed circumstances since the quarry was last active. Defs.' Counterclaim Ex. G. Morano did not send that email to Hanson or Pierson.

On December 29, 2017, Morano responded to Pierson's December 11 and 21 letters. In her response, she indicated that there appeared to be "new and/or altered structures, equipment and/or uses proposed for the property" and that a special exception would therefore be necessary before Pierson could proceed with the "proposed use and/or improvements." Defs.' Counterclaim Ex. H. Pierson responded to Morano's December 29, 2017 letter on January 4, 2018. It argued that the proposed use of the quarry was consistent with how it has always been used and noted that the Township previously issued annual zoning permits without referring to any special exception requirement. Defs.' Counterclaim Ex. I.

Prior to that response, on the same day that Morano responded to Pierson's letters—December 29, 2017—Hanson had submitted a letter to the Township along with a 2018 Zoning Permit Application, Existing Land Use Overlay Plans, and Site Plans. That same day, as a supplement to the 2018 Zoning Permit Application, Pierson had submitted a letter that confirmed compliance with the requirements in the Township's zoning ordinance for issuance of an H12 Extractive Operation Permit, a report regarding traffic routes, and the DEP General Plan Approval and General Operating Permit for certain temporary equipment to be used at the quarry.

On January 12, 2018, Morano replied to Hanson and Pierson's application materials in a letter that stated the following findings: Pierson would need to obtain a special exception; Pierson was not compliant with various zoning requirements; Pierson could only obtain relief related to the asphalt plant from the Zoning Hearing Board; and land development approval would be necessary to transport the portable quarrying equipment or to place trailers on the existing foundations. *See* Defs.' Counterclaim Ex. J. Based on these findings, the Township denied Hanson and Pierson's 2018 Zoning Permit Application. *Id.* The Township also decreed that the proposed new use and related improvements necessary for asphalt production must cease until all approvals could be obtained. *Id.* On June 15, 2018, Morano, as Township Manager, further informed DEP that the Township objected to DEP issuing an air quality plan approval for Pierson to install and operate a stone crusher. *See* Defs.' Counterclaim Ex. K.

Hearings before the Zoning Hearing Board proceeded over several sessions without resolution. The Township, concerned that Hanson and Pierson intended to proceed with the installation of an asphalt plant, sued in state court to enjoin its operation. *See* Defs.' Notice of Removal Ex. A. Significantly, the Township did not seek to enjoin the operation of the quarry; public hearings as to the terms under which it should operate continued. Following removal, Hanson and Pierson sought an injunction requiring the Township to allow operation of both the quarry and the asphalt plant. After a bench trial, I enjoined the Township from interfering with operation of the quarry under the Declaratory Judgment Act, finding that exclusive jurisdiction to regulate quarry operations rested with the DEP. I abstained from ruling as to the asphalt plant, finding state law at best unsettled, if not adverse to Hanson and Pierson. *East Rockhill Twp.*, 364 F. Supp. 3d at 447.

In advancing their counterclaims, Hanson and Pierson contend that the actions on the part of Township officials summarized above were arbitrary because those officials knew that they lacked the authority to regulate quarry operations and acted only in response to the views of residents. In support, Hanson and Pierson cite the following evidence:

- On December 19, 2017, in an email to a resident, Morano wrote that it is "the DEP Pottsville Mining Office who will be reviewing the Rockhill Quarry permit. DEP supersedes a lot of Township regulations for the Quarry." Defs.' Counterclaim ¶ 83.
- At a Board meeting on December 26, 2017,[3] the Board and/or Volovnik, Nyman, or Nietupski made the following comments:
    - "The Quarry is regulated by DEP and therefore within the operator's rights;"
    - "The Board cannot stop the operations, but they will attempt to control them;"
    - "Yes, they have permits and are regulated by the state; they have been there for a very long time; we cannot shut them down;"
    - "They are governed by the DEP; they have to go to the state; not us;" and
    - "Land development may be preempted by DEP." *Id.* ¶ 84.
- At a January 23, 2018 Board meeting, Nyman stated "there's a whole act that covers this: the Noncoal Surface Mining Conservation and Reclamation Act; every quarry has to develop a specific plan to be approved by DEP for that specific site." *Id.* ¶ 87.
- At a July 24, 2018 Board meeting, Nyman further stated that "the Pennsylvania Department of Environmental Protection controls quarrying operations; the Township does not." *Id.* ¶ 88.

---

[3] The Counterclaim indicates that these statements were made at a meeting on December 2, which I assume is a typographical error. Counterclaim Plaintiffs' Response also states that the comments were made at a December 27 board meeting, but all other references to such a board meeting—elsewhere in the Counterclaim, in the Motion to Dismiss, and elsewhere in the Response—indicate that it occurred on December 26.

Based on these various statements, Pierson and Hanson maintain that township officials acted based on "political and personal reasons or animus unrelated to the merits of the use or any requirements of law." *Id.* ¶ 97. They further contend that local political pressure motivated the Township and its officials to attempt to regulate quarry operations despite knowing that such regulation is preempted under the Pennsylvania Mining Act. Specifically, they argue that the Township rejected the 2018 Zoning Permit Application only "because Pierson seeks to increase the Quarry's operations." *Id.* ¶ 99. Finally, Pierson asserts that Counterclaim Defendants Volovnik, Nyman, Nietupski, and Morano acted intentionally and improperly to interfere with Pierson's ability to perform the Turnpike Project contract.

## II.    Legal Standard

*Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009), provides the standard for consideration of motions to dismiss under Rule 12(b)(6).

## III.    Discussion

*A. Substantive Due Process*

Hanson and Pierson urge that the Township's efforts to regulate the quarry and asphalt plant violated Hanson and Pierson's Fourteenth Amendment substantive due process rights. To properly allege a violation of substantive due process, a plaintiff must show (1) a property interest protected by the Fourteenth Amendment[4] and (2) deprivation of that interest due to behavior by local officials that shocks the conscience. *Perano v. Twp. of Tilden*, 2010 WL 1462367, at *7 (E.D. Pa. Apr. 12, 2010) (citing *Chainey v. Street*, 523 F.3d 200, 219 (3d Cir. 2008)), *aff'd* 423 F. App'x 234 (3d Cir. 2011).

---

[4] There is no dispute here that Hanson and Pierson have a protected property interest.

The Third Circuit expressly adopted the shocks the conscience standard for land use actions in *United Artists Theatre Circuit, Inc. v. Township of Warrington*, repudiating the "less demanding improper motive test" that had previously governed such cases. 316 F.3d 392, 400 (3d Cir. 2003) (internal quotation marks omitted). The Court has noted that the heightened standard "is designed to avoid converting federal courts into super zoning tribunals." *Eichenlaub v. Twp. of Indiana*, 385 F.3d 274, 285 (3d Cir. 2004). Accordingly, a substantive due process claim cannot survive if the challenged conduct does not "rise sufficiently above that at issue in a normal zoning dispute to pass the 'shocks the conscience test.'" *Id.* at 286.

What shocks the conscience "varies depending on the factual context," *id.* at 285 (quoting *United Artists*, 316 F.3d at 400), but the standard encompasses "only the most egregious official conduct." *Id.* (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)). Actions taken in violation of state law, in bad faith, due to improper motive, or based on considerations outside the actor's jurisdiction are generally not sufficiently egregious to shock the conscience. *See United Artists*, 316 F.3d at 402 (citing with approval *Chesterfield Dev. Corp. v. City of Chesterfield*, 963 F.2d 1102, 1104-05 (8th Cir. 1992); *PFZ Props., Inc. v. Rodriguez*, 928 F.2d 28, 32 (1st Cir. 1991); *Creative Env'ts, Inc. v. Estabrook*, 680 F.2d 822, 833 (1st Cir. 1982)); *Corneal v. Jackson Twp.*, 313 F. Supp. 2d 457, 466 (M.D. Pa. 2003), *aff'd* 94 F. App'x 76 (3d Cir. 2004).[5] Absent claims of corruption, self-dealing, bias against an ethnic group, or intent to interfere with constitutionally-protected activity, the Third Circuit and district courts have hesitated to find official behavior in the land use context conscience-shocking. *See Eichenlaub*, 385 F.3d at 286; *Thorpe v. Upper Makefield Twp.*, 271 F. Supp. 3d 750, 755 (E.D. Pa. 2017), *aff'd*, 758 F. App'x 258 (3d Cir. 2018); *Good v. Trish, et al.*, 2007 WL 2702924, at *6 (M.D. Pa.

---

[5] *See also Lindquist v. Buckingham Twp.*, 106 F. App'x 768, 774 (3d Cir. 2004).

Sept. 13, 2007) (quoting *Prosperi v. Twp. of Scott*, 2006 WL 2583754, at *4 (W.D. Pa. Sept. 7, 2006)); *Highway Materials, Inc. v. Whitemarsh Twp.*, 2004 WL 2220974, at *13 (E.D. Pa. Oct. 4, 2004), *aff'd*, 386 F. App'x 251 (3d Cir. 2010); *Blain v. Twp. of Radnor*, 2004 WL 1151727, at *4, 5-6 (E.D. Pa. May 21, 2004), *aff'd*, 167 F. App'x 330 (3d Cir. 2006).

Numerous district courts in this circuit have concluded that even official actions alleged to be wrong, unfair, taken in bad faith, or intended to delay do not suffice to shock the conscience, and in each instance these decisions were affirmed. *See Dev. Grp., LLC. v. Franklin Twp. Bd. of Supervisors*, 2004 WL 2812049, at *18 (E.D. Pa. Dec. 7, 2004) (Baylson, J.) (unfair treatment of plaintiffs, however "wrong, mean, or improperly motivated" did not shock the conscience), *aff'd*, 162 F. App'x 158 (3d Cir. 2006); *Blain*, 2004 WL 1151727, at *5 (Kauffman, J.) ("possible impropriety and bad faith" did not "rise to the level of a substantive due process violation"), *aff'd*, 167 F. App'x 330 (3d Cir. 2006); *Levin v. Upper Makefield Twp.*, 2003 WL 21652301, at *9 (E.D. Pa. Feb. 25, 2003) (Davis, J.) (bad motive, purposeful intention to delay permit, and senseless, premature cashing of plaintiff's permit fee check did not shock the conscience), *aff'd*, 90 F. App'x 653 (3d Cir. 2004).

Even where a plaintiff alleges corruption, such conduct may not shock the conscience if it relates to a legitimate government purpose. *See Thornbury Noble, LTD. v. Thornbury Twp.*, 2003 WL 23842520, at *7 (E.D. Pa. Oct. 21, 2003) (O'Neill, J.), *aff'd* 112 F. App'x 185, 188 (3d Cir. 2004). In *Thornbury Noble*, Judge O'Neill concluded as a matter of law that a township zoning board's favoritism toward one developer over another did not shock the conscience even though the favored developer made a $600,000 contribution to the township for the purchase of open space. *Id*. In the aftermath of *United Artists*, he reasoned that because the board was motivated by concern for the amount of open space in the township, not personal gain, its

hastening of the approval process for one developer and slowing of the process with respect to the plaintiff did not shock the conscience. *Id*. In affirming, a panel of the Third Circuit observed that even the most nefarious interpretation of the board's actions—that it selected one developer over another because of the $600,000 contribution—could not be considered to shock the conscience, because it was motivated by a legitimate municipal goal. *Thornbury Noble*, 112 F. App'x at 188.

Several courts in this Circuit have concluded that *any* relationship between the challenged action and a legitimate government purpose prevents a finding that the conduct shocks the conscience. *See Good*, 2007 WL 2702924, at *6 (dismissing claims because the court could not conclude that the official's "actions bore *no reasonable relation* to the legitimate government interest in enforcing local land use ordinances"); *Blain*, 2004 WL 1151727, at *6 (concluding that "[d]efendants' pursuit of a legitimate interest through the improper application of the Township's ordinances does not amount to a constitutional violation"); *Corneal*, 313 F. Supp. 2d at 466 (noting that "unless the evidence indicates that the challenged decision is completely unrelated in any way to a rational land use goal, there is no violation of substantive due process").

The facts alleged in the Counterclaim do not demonstrate a lack of a legitimate government purpose, nor do they advance any claims of corruption or self-dealing. The crux of the complaint is that when East Rockhill officials denied the zoning permit and demanded compliance with additional requirements, they knew they lacked the authority to regulate the quarry and acted improperly in response to local residents' opposition. I cannot conclude that such action is unrelated to any legitimate government goal, because responding to citizen concerns about maintaining current land use in the face of proposed changes falls well within the

10

realm of legitimate government goals. *See Corneal*, 313 F. Supp. 2d at 467-68 (finding that Board's decision, in response to citizen concerns, to impose a moratorium on development pending enactment of a land use ordinance was not unrelated to legitimate land use planning goal). In fact, responsiveness to citizens' concerns is what we expect of public officials. In that regard, it bears emphasis that, from the perspective of the surrounding community, the quarry had been inactive for more than 30 years, and its renewed operation was to be accompanied by an asphalt plant, which would involve truck traffic into the night on some paving projects. *See* Defs.' Counterclaim Ex. G; Defs.' Counterclaim Ex. K; *East Rockhill Twp.*, 364 F. Supp. 3d at 442, 446. The most that can be argued is that Township officials violated state law, which falls far short of conduct that shocks the conscience. *Corneal*, 313 F. Supp. 2d. at 470.

The Counterclaim further fails to allege any corruption, self-dealing, bias, or intent to interfere with constitutionally-protected activity. The statements cited in the counterclaim show, at most, an awareness that "DEP supersedes a lot of Township regulations for the Quarry," Defs.' Counterclaim ¶ 83, and that the Township was without power to "shut them down" altogether. *Id.* ¶ 84. They do not demonstrate that the Township believed it was totally without power to take steps to limit an increase in operations or restrict installation of an asphalt plant, and they certainly do not show that it took such action for personal gain, out of bias, or with other corrupt motives. *See Eichenlaub* 385 F.3d at 286.[6]

Against this battery of precedent, Hanson and Pierson seek to rely upon a non-precedential decision, *Lonzetta Trucking and Excavating Co. v. Schan*, 144 F. App'x 206 (3d Cir. 2005). As a general matter, non-precedential opinions carry little weight because the Third

---

[6] *See also Keystone Outdoor Advert. Co., Inc. v. W. Whiteland Twp.*, 64 F. App'x 333, 335 (3d Cir. 2003) (concluding that absent "private gain or any other suspect motivation," a claim "fails to meet even the less stringent standard of showing 'improper motives' . . . let alone demonstrating actions that would 'shock the conscience'") (citation omitted).

11

Circuit itself will not cite them as authority in deciding a case. 3d Cir. Internal Operating P. 5.7 (2018). More specifically, although some facts identified in *Lonzetta* resemble this case, the Court's discussion of those facts is quite limited. The scant discussion has made other district courts hesitant to rely upon *Lonzetta*. *See Honey Brook Estates v. Honey Brook Twp.*, 2012 WL 2076985, at *16 (E.D. Pa. June 7, 2012); *Cranberry Promenade Inc. v. Cranberry Twp.*, 2011 WL 13257871, at *18 (W.D. Pa. Dec. 29, 2011); *Cherry Hill Towers, LLC v. Twp. of Cherry Hill*, 407 F. Supp. 2d 648, 656-57 (D. N.J. 2006). The principal focus of the appeal in *Lonzetta* was whether the governmental defendants were entitled to absolute or qualified immunity. The opinion only briefly refers to a report and recommendation from a magistrate judge identifying disputed issues of fact but does not analyze how the actions of local officials could be said to have shocked the conscience. I therefore hesitate to give *Lonzetta* much weight, particularly given the wealth of precedent emphasizing the stringency of the controlling standard.

Hanson and Pierson also observe that many of the decisions involving substantive due process in land use cases were rendered at the summary judgment stage and argue that this Motion is premature. But decisions reached at the summary judgment stage establish the governing legal standard for what constitutes a plausible claim of denial of substantive due process. Where, as here, a plaintiff's factual allegations—accepted as true—fall well short of the minimum legal requirements to state a claim, dismissal on a 12(b)(6) motion is appropriate. *See Perano*, 2010 WL 1462367, at *8; *Good*, 2007 WL 2702924, at *6; *Johnston v. Dauphin Borough*, 2006 WL 1410766, at *6 (M.D. Pa. May 22, 2006); *see also Fletcher–Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 251 (3d Cir. 2007).

Accordingly, I will dismiss the substantive due process claim for failure to state a claim.[7]

---

[7] Because Counterclaim Plaintiffs have failed to allege a violation of their substantive due process rights, I need not address the defense of qualified immunity.

B. *Tortious Interference with a Contractual Relationship*

Pierson separately claims that Township officials Volovnik, Nyman, Nietupski, and Morano tortiously interfered with its contractual relations. Under Pennsylvania law, a claim for tortious interference with contractual relations requires a showing that: "(1) a contractual or prospective contractual relationship existed between plaintiff and a third party; (2) defendant took purposeful action, intended to harm that relationship; (3) that no privilege or justification applies to the harmful action; and (4) damages resulted from the defendant's conduct." *Intervest Fin. Servs., Inc. v. S.G. Cowen Sec. Corp.*, 206 F. Supp. 2d 702, 721 (E.D. Pa. 2002) (citing *Remick v. Manfredy*, 238 F.3d 248, 263 (3d Cir. 2001)), *aff'd sub nom. InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144 (3d Cir. 2003).

Defendants argue that Pierson has failed to show they acted without privilege or justification, as required under the third element. In Pennsylvania, the plaintiff must demonstrate a lack of privilege or justification as part of the prima facie case, and failure to do so results in dismissal of the claim. *See Thompson Coal Co. v. Pike Coal Co*., 412 A.2d 466, 471 n.7 (Pa. 1979); *Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 214 (3d Cir. 2009) (quoting *Triffin v. Janssen*, 626 A.2d 571, 574 n.3 (Pa. Super. Ct. 1993)). There are comparatively few reported cases discussing privilege in the context of tortious interference with contract suits against governmental officials. Where the challenged action involves the exercise of regulatory power, however, privilege becomes a central consideration, [8] and in many ways, the controlling principles parallel the factors employed in analyzing a substantive due process claim. Having

---

[8] The Court may properly determine whether conduct is privileged. *See Windsor Sec., Inc. v. Hartford Life Ins. Co.*, 986 F.2d 655, 663-66 (3d Cir. 1993) (applying Restatement (Second) of Torts § 767 (1979)); *Schulman v. J.P. Morgan Inv. Management, Inc*., 35 F.3d 799, 809-10 (3d. Cir. 1994) (applying Restatement (Second) of Torts §§ 769, 773 (1979)).

analyzed the issue of privilege using the factors set forth in § 767 of the Restatement (Second) of Torts, on which Pennsylvania courts rely, *Adler, Barish, Daniels, Levins & Creskoff v. Epstein*, 393 A.2d 1175, 1184 (Pa. 1978), I conclude that Pierson has not stated a claim.[9]

"What is or is not privileged conduct in a given situation is not susceptible of precise definition," and the propriety of an interference must be considered in terms of "the 'rules of the game' which society has adopted." *Glenn v. Point Park Coll.*, 272 A.2d 895, 899 (Pa. 1971) (citations omitted). To establish an absence of privilege or justification, a plaintiff must show "not only that a defendant acted intentionally to harm the plaintiff, but also that those actions were improper. In determining whether a defendant's actions were improper, the trial court must take into account the [ ] factors listed in Restatement (Second) of Torts section 767." *Salsgiver Commc'ns, Inc. v. Consol. Commc'ns Holdings, Inc.*, 150 A.3d 957, 966 (Pa. Super. Ct. 2016) (alteration in original) (quoting *Empire Trucking Co., Inc. v. Reading Anthracite Coal Co.*, 71

---

[9] The failure to state a claim for an intentional tort also ensures that immunity applies to Counterclaim Defendants Volovnik, Nyman, Nietupski, and Morano under Pennsylvania law. The Pennsylvania Subdivision Tort Claims Act (PSTCA) extends to employees of local agencies the same immunities afforded to the agencies themselves. 42 Pa. Cons. Stat. § 8545; *see* 42 Pa. Cons. Stat § 8541; *Wnek v. City of Phila.*, 2007 WL 1410361, at *4 (E.D. Pa. May 10, 2007); *Pollarine v. Boyer*, 2005 WL 1806481, at *3 (E.D. Pa. July 29, 2005). None of the enumerated exceptions to immunity, *see* 42 Pa. Cons. Stat § 8542, apply here, but a municipal employee may nonetheless be held liable for damages "caused by the act of the employee in which it is judicially determined that the act of the employee caused the injury and that such act constituted a crime, actual fraud, actual malice or willful misconduct." 42 Pa. Cons. Stat. § 8550. "'Willful misconduct' in this context 'has the same meaning as the term intentional tort.'" *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 214 (3d Cir. 2001) (quoting *Delate v. Kolle*, 667 A.2d 1218, 1221 (Pa. Commw. Ct. 1995)). Thus, "individual zoning board members can be held liable if they 'intentionally reached the wrong decision knowing that it was wrong, acted from corrupt motives, or engaged in any other type of conduct which would demonstrate willful misconduct.'" *Thornbury Noble, Ltd. v. Thornbury Twp. Bd. of Supervisors*, 2000 WL 1358483, at *4 (E.D. Pa. Sept. 20, 2000) (quoting *Delate*, 667 A.2d at 1221). But where, as here, the plaintiffs have not pled sufficient facts to allege an intentional tort, the willful misconduct exception to immunity does not apply. *See Cornell Companies, Inc. v. Borough of New Morgan, et al.*, 512 F. Supp 2d 238, 277 (E.D. Pa. 2007) (concluding that, because the complaint stated a claim for tortious interference, the exception to immunity applied).

Pierson's assertion that immunity does not apply because the individual defendants were sued in their personal rather than official capacities has no merit under Pennsylvania law, because Pierson has asserted a tort claim, subject to the provisions of the Political Subdivision Tort Claims Act set forth above.

A.3d 923, 934 (Pa. Super. Ct. 2013)). Those factors include: "(a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties." *Id.* at 966 (quoting Restatement (Second) of Torts § 767 (Am. Law Inst. 1979)); *Windsor Sec., Inc. v. Hartford Life Ins. Co.*, 986 F.2d 655, 663 (3d Cir. 1993) (citation omitted).

Applying the Restatement factors to the facts alleged here, I cannot conclude that Township officials acted improperly. First, the nature of their conduct—"a chief factor" in determining propriety—was proper for zoning board officials. *See* Restatement (Second) of Torts § 767 comment c (Am. Law Inst. 1979); *Crivelli v. Gen. Motors Corp.*, 215 F.3d 386, 395 (3d Cir. 2000). Specifically, the officials chose to deny Pierson's Zoning Permit Application, requiring compliance with various zoning requirements, and ordered that asphalt production must cease until additional approvals were obtained. *See* Defs.' Counterclaim Ex. J. Morano also informed DEP that the Township objected to DEP issuing an air quality plan approval for Pierson to install and operate a stone crusher. Such actions constitute normal behavior for government officials in zoning disputes.

Pierson contends that the Township officials' actions were nonetheless improper and not privileged because the officials were aware that their authority was preempted. The averments cited in the Counterclaim demonstrate that the Board members were aware of significant limitations on their authority, specifically that DEP superseded the Township's authority to regulate the quarry in many areas and that the Township lacked the authority to prohibit quarry operations. Defs.' Counterclaim ¶¶ 83, 84. They do not show that Volovnik, Nyman,

Nietupski, or Morano believed the Township to be entirely without power to address the concerns of residents. Taking into account that the quarry had been dormant for some 30 years and the fact that the character of the surrounding area had changed, I cannot conclude that it was improper for Township officials to explore the limits of their regulatory authority. Furthermore, in bringing an enforcement action in court, the Township sought only to enjoin the operation of the asphalt plant, and I have separately held that, on balance, Pennsylvania law favors the Township's position that it has the power to limit such use. *East Rockhill Twp.*, 364 F. Supp. 3d at 447. In context, the Township officials' conduct cannot be deemed improper.

As to the Township officials' motives—the second Restatement factor—Pierson affirmatively pleads that they acted in response to local residents' complaints. I cannot fault government officials for responding to constituent concerns. Pierson's allegations that the Township officials acted in violation of state law are insufficient to call into question whether they were motivated by genuine public concerns. My assessment of motive is related to my consideration of the fourth factor—interests advanced by the officials' conduct—and one aspect of the fifth factor—the social interests in protecting the officials' freedom of action. *See* Restatement (Second) of Torts § 767 comment d (Am. Law Inst. 1979). I conclude that the Township officials have a strong interest in advocating for the community's well-being and giving voice to local residents' views on land use policy. Representative government requires that officials consider and respond to the concerns of citizens, and officials' freedom to serve their constituents without fear of repercussions (except from the electorate) is of great social utility. *See id.* at comments f, g. Pierson has not sufficiently challenged the motive of the individual officials by plausibly alleging that they pursued the public interest in bad faith or through wrongful means. *See id.* at comment f.

I conclude that the actions of Township officials are privileged even as I also acknowledge the social interest in protecting Pierson's contractual rights—the third Restatement factor—and Pierson's direct interest in reaping the benefits of his contract with the Turnpike Commission—an element of the fifth Restatement factor. For that matter, the Turnpike Project itself serves a social interest. But the question before me is "whether, upon a consideration of the relative significance of the factors involved, the conduct should be permitted without liability, *despite* its effect of harm to another." *Triffin*, 626 A.2d at 574 (quoting Restatement (Second) of Torts § 767 comment b (Am. Law Inst. 1979)) (emphasis added). By definition, regulatory actions taken by governmental officials will impact the commercial activities of those subject to such regulation. Courts should therefore exercise caution before attaching tort liability to the decision-making process of such officials. After balancing all of the Restatement factors,[10] I conclude that the allegations set forth in the Counterclaim do not suffice to establish Township officials acted improperly. Absent clear allegations that they knew their decisions were totally without any colorable legal foundation, or that they acted with corrupt motives, their efforts to regulate the reactivation of the quarry, including the asphalt plant, were privileged and justified.

Pierson therefore has not stated a claim for tortious interference with contractual relations, and I will grant the Motion to Dismiss with respect to this claim as well.

Both remaining counts of the Counterclaim will be dismissed with prejudice.

                                                                        /s/ Gerald Austin McHugh

---

[10] The final two factors—the proximity of the conduct to the interference and the relation between the parties—do not tip the balance in either direction on these facts. The denial of the permit pending additional approvals rendered Pierson temporarily but not permanently unable to carry out its contract, although such a result was possible. *See* Restatement (Second) of Torts § 767 comment h (Am. Law Inst. 1979). The relation between the parties typically refers to whether parties are competitors or in another business relationship and does not seem to contemplate action by government officials. *See id.* at comment i.

17

United States District Judge